UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TONYA GUNTER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED FEDERAL CREDIT UNION, DOES 1-5 inclusive and ROE CORPORATIONS 6-10, inclusive,<br><br>Defendants. | Case No. 3:15-cv-00483-MMD-WGC<br><br>ORDER<br><br>(Pl.'s Motion for Class Certification and Appointment of Counsel – ECF No. 64; Def.'s Motion for Partial Summary Judgment – ECF No. 67) |

**I.  SUMMARY**

Before the Court is Plaintiff Tonya Gunter's Motion for Class Certification and Appointment of Counsel ("Class Certification Motion") (ECF No. 64) and Defendant United Federal Credit Union's ("United") Motion for Partial Summary Judgment ("Motion") (ECF No. 67). The Court has reviewed these documents as well as the parties' respective responses and replies. (ECF Nos. 69, 80, 81, 84.) Defendant's Motion is denied, and Plaintiff's Class Certification Motion is granted for the reasons discussed below.

**II.  BACKGROUND**

Gunter has a checking account with United, a credit union. Gunter alleges that United charged her overdraft fees when she had sufficient funds in her checking account to cover the transactions. (ECF No. 64 at 7.) Although her actual balance was high enough to cover the transactions, her available balance was not. (*See id.* at 7-8.)

United authorizes overdrafts based on the "available balance" of accounts rather than "actual balance."[1] (*See* ECF No. 69 at 3.) Actual balance refers to the amount of all funds currently in a client's account. (*Id.*) Available balance refers to the actual balance less holds, such as debit holds. Debit holds occur when clients use a debit card like a credit card, i.e., by swiping it and signing a receipt. It usually takes a few days for these transactions to post and reduce the actual balance of an account. (*See id.*) In the meantime, the hold renders the amount of the transaction unavailable. The hold does not alter the actual balance. (*See id.*)

Gunter contends that United's practice violates its contractual agreements with its clients and that United failed to properly disclose its practice in violation of federal law. (ECF No. 64 at 8.)

Regarding her contractual claim, Gunter argues that United's practice violates two kinds of contracts that govern United's relationships with its clients. The first are United's "account agreements," contracts that govern the relationship between United and its clients with checking accounts. (*See id.*) Gunter alleges that the account agreements only permit United to authorize overdrafts based on actual balance—not available balance. (*See id.* at 9.) The second are United's "opt-in agreements," contracts that permit United to provide overdraft services. (*Id.*) Gunter alleges that the opt-in agreements do not adequately disclose that United will authorize overdrafts based on available (rather than actual) balance. (*Id.* at 10.)

As such, Gunter seeks to certify a class ("Positive Balance Class") consisting of the following individuals to prosecute her breach of contract claim:

> [T]hose members of [United] who were charged an overdraft fee between October 3, 2011, and the present for a transaction posted by the MISER system when at the time the transaction posted the class member's actual balance was equal to or greater than the transaction causing the overdraft.

(ECF No. 64 at 18.)

---

[1] The parties also use the term "ledger balance" as a synonym for actual balance.

Gunter further contends that United failed to adequately disclose its practice pursuant to Regulation E, a federal regulation implementing the Electronic Fund Transfer Act. (ECF No. 64 at 27.) Regulation E requires financial institutions to obtain affirmative consent from clients before authorizing overdrafts. Requirements for Overdraft Services, 12 C.F.R. § 1005.17 (2017). Regulation E also prescribes the form and contents of the disclosure financial institutions use to obtain affirmative consent. *Id.* Here, United's disclosure was contained in its opt-in agreement, and Gunter alleges that the opt-in agreement fails to satisfy Regulation E's requirements. (ECF No. 64 at 27.)

As such, Gunter seeks to certify a second class (Regulation E Class) consisting of the following individuals to prosecute her Regulation E claim:

> [T]hose members of [United] who opted in to [United's] debit card overdraft service and were charged an overdraft fee for an ATM or debit card transaction at any time between August 15, 2010, through the present.

(ECF No. 64 at 18-19.)

### III. DEFENDANT'S MOTION

#### A. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is material if it could affect the outcome of the suit under the governing law. *Id.*

Summary judgment is not appropriate when "reasonable minds could differ as to the import of the evidence." *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is [that which is] enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Decisions granting or denying summary judgment are

made in light of the purpose of summary judgment: "to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008). If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . ." *Anderson*, 477 U.S. at 252.

**B.     DISCUSSION**

United moves for summary judgment on Gunter's claim that United violated the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r (2015). (ECF No. 67 at 1.) The EFTA's implementing regulations require financial institutions to describe the overdraft services they offer and obtain customers' affirmative consent before authorizing overdrafts. 12 C.F.R. § 1005.17. Gunter argues that United violated the EFTA and its implementing regulations by failing to specify whether United authorized overdrafts based on clients' actual balance or available balance. (ECF No. 80 at 19.)

United argues that it complied with Regulation E's notice requirements and should receive the protection of the EFTA's safe harbor provisions. (ECF No. 67 at 13-14.) The Court disagrees with United.

### 1. Regulation E

Regulation E, 12 C.F.R. pt. 205 (2017), implements the EFTA, which protects individual consumer rights by providing "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund . . . transfer systems." 15 U.S.C. § 1693(b) (2015). The EFTA is a "remedial statute accorded a broad, liberal construction in favor of the consumer." *Bultemeyer v. Fitness All., LLC*, No. CV-12-2619-PHX-LOA, 2014 WL 667585, at *3 (D. Ariz. Feb. 20, 2014) (citing *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 350 (6th Cir. 2008)).

Regulation E requires financial institutions to obtain affirmative consent from their clients before assessing overdraft charges on ATM or one-time debit card transactions. *See* 12 C.F.R. § 1005.17(b). To obtain affirmative consent, financial institutions must provide clients with an opt-in notice describing the overdraft service among other things. *Id.* § 1005.17(b)(1)(i)-(iv).

The opt-in notice must conform to Regulation E's requirements. *Id.* § 1005.17(d). The opt-in notice must be "substantially similar" to a model form, Model Form A-9. *Id.*; *see also id.* pt. 1005 app. A. The opt-in notice must include *inter alia* a "brief description of the financial institution's overdraft services." *Id.* § 1005.17(d)(1). The notice cannot contain "any information not specified or otherwise permitted by" paragraph (d), which requires and permits the inclusion of certain information not relevant here. *Id.* § 1005.17(d).

### 2. Safe Harbor

The EFTA imposes civil liability for noncompliance with Regulation E but also contains two safe harbor provisions. *See* 15 U.S.C. § 1693m (2015). One applies to "any act done . . . in good faith in conformity with any . . . regulation." *Id.* § 1693m(d)(1). Summary judgment cannot be granted under this safe harbor because it requires

resolution of a genuine issue of material fact—whether United acted in good faith when it failed to completely disclose the terms of the overdraft service. Neither party has yet addressed whether United acted in good faith in any detail.

The other safe harbor applies to "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board." *Id.* § 1693m(d)(2). United may not rely on the second safe harbor provision because Gunter does not allege that United failed to make disclosure in "proper form." Rather, Gunter alleges that United's opt-in agreement does not contain the proper content. *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 118859, at *7 (N.D. Cal. Jan. 12, 2017); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 852 (W.D. Mich. 2016); *see also Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass. 2005) ("[T]he statutory language [of the safe harbor provision] suggests that this defense insulates an institution from a challenge as to the form—not the adequacy—of the disclosure.").

United argues that Regulation E precludes additional language that would explain United authorizes overdrafts based on clients' available balance rather than actual balance. (ECF No. 67 at 15-16.) While it is true that Regulation E prohibits financial institutions from including "any information not specified in or otherwise permitted by" paragraph (d), Regulation E requires the opt-in notice to contain "[a] brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions." 12 C.F.R. § 1005.17(d)(1). United could have explained that it authorizes overdrafts based on available balance rather than actual balance without violating Regulation E because Regulation E expressly requires financial institutions to describe their overdraft services. Presumably that description must be accurate and not misleading. United implicitly contends that it would have faced liability for including such a description because its opt-in agreement must be "substantially similar" to Model Form A-9, *id.* § 1005.17(d), but such a description would not destroy substantial similarity. In

6

fact, such a description would further the purpose of the regulation to help consumers understand the overdraft services their financial institutions offer. Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035 (Nov. 17, 2009) (codified at 12 C.F.R. § 1005.17).

## IV. PLAINTIFF'S CLASS CERTIFICATION MOTION

### A. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The party seeking class certification "must affirmatively demonstrate his compliance with the rule." *Id.* at 350. "[C]ertification is proper only if the 'trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). The four Rule 23(a) requirements are numerosity, commonality, typicality, and adequacy of representation. *Id.* at 349; Fed. R. Civ. P. 23(a). The party seeking class certification need not demonstrate that there is an administratively feasible means of identifying absent class members.[2] *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites." *Id.* at 615. First, "common questions must 'predominate over any questions affecting only individual members.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(b)(3)). Second, "class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

---

[2]The parties debate ascertainability in some detail without referencing the Ninth Circuit's decision in *Briseno*. (ECF No. 69 at 12-15; ECF No. 81 at 11-15.)

The moving party must affirmatively demonstrate that he or she meets the above requirements. *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014) (citing *Dukes*, 564 U.S. at 350). However, a court should not "'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

B. DISCUSSION

1. Rule 23(a) Requirements

a. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 330 (1980). "Additionally, it is not necessary to state the exact number of class members when the plaintiff's allegations 'plainly suffice' to meet the numerosity requirement." *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009).

The numerosity requirement is satisfied here because United's Rule 30(b)(6) witness testified that a large number of its clients opted in to its overdraft services.[3] (ECF No. 64 at 20.) Even if a small percentage of these clients meet the class criteria, there could easily be hundreds or thousands of class members.

b. Commonality

"[C]ommonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350). These common questions may center on "shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies." *Hanlon*, 150 F.3d

---

[3]The actual numbers were filed under seal pursuant to the protective order. (ECF No. 50.)

at 1019. "[A] class meets Rule 23(a)(2)'s commonality requirement when the common questions it has raised are 'apt to drive the resolution of the litigation,' no matter their number." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 962 (9th Cir. 2013)).

Members of the proposed Positive Balance Class share the same legal questions and predicate facts. All proposed class members were subject to the same contractual language regarding overdraft fees in their account agreements and opt-in agreements. (ECF No. 64 at 21.) Although United clients have been subject to different account agreements over the years, the language regarding overdrafts has remained consistent. (*Id.* at 8 n.2.) And all proposed class members were charged an overdraft fee based on their available balance instead of their actual balance. (*See* ECF No. 64 at 18.) Thus, all proposed class members share the legal question of whether United breached its contractual obligations regarding overdraft fees when it authorized overdraft fees based on those clients' available (rather than actual) balance.

Members of the proposed Regulation E Class also share the same legal questions and predicate facts. All proposed class members opted in to the overdraft service. (ECF No. 64 at 18.) All proposed class members were charged an overdraft fee even though United failed to properly disclose its method for assessing overdraft fees. (*Id.*) Thus, all proposed class members share the same legal question of whether United violated Regulation E when it failed to disclose its method for assessing overdraft fees.

### c. Typicality

The commonality and typicality requirements, though distinct, tend to merge. *Dukes*, 564 U.S. at 349 n.5. Both requirements aid the court in determining whether maintaining a class is feasible and "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* The question a court must ask when evaluating typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether

other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Claims need not be absolutely identical; they need only be "reasonably co-extensive with those of absent class members." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1020).

United argues that Gunter's claims are not typical of the proposed Regulation E Class because Gunter has been subject to only two of four different account agreements United has used with its clients. (ECF No. 69 at 7-8.) The four account agreements correspond to the four different database systems United has used with its clients during the relevant time period: Symitar, MISER, Ultradata, and ITI. (*Id.* at 8.) Gunter was subject to the Symitar agreement and later the MISER agreement. (*Id.*) United contends that these account agreements contain different disclosures that lead to different defenses. (*Id.*) United fails, however, to identify these differences or explain how they necessitate different defenses. (*See id.*) Moreover, United's 30(b)(6) witness has testified that the operative language in the account agreements regarding overdraft services has been consistent throughout the relevant time period. (ECF No. 64 at 8 n.2.) As a result, the Court finds United's argument unpersuasive.

United next argues that Gunter's claims are not typical of the proposed classes because Gunter signed an account agreement with Clearstar (a credit union subsequently acquired by United) that included a disclosure that fees for overdrawing accounts would be based on clients' available balance. (ECF No. 69 at 9.) But Gunter's breach of contract claim remains typical of the Positive Balance Class because she alleges she became subject to the MISER account agreement, an agreement that contained no such disclosure. (*See* ECF No. 81 at 5-6.) Transactions that took place in Symitar pursuant to the Clearstar account agreement are irrelevant to the Positive Balance Class. (*See id.*; ECF No. 64 at 18.) Gunter's Regulation E claim remains typical of the Regulation E Class because that claim is based on the adequacy of United's opt-
///

in agreement. Other agreements are irrelevant to the question of whether United violated Regulation E.[4]

United further argues that Gunter's claims are not typical of either proposed class because United has few clients who overdrafted as much as Gunter. (ECF No. 69 at 10.) But Gunter's unusually frequent overdrafts suggest that she has suffered from United's practice more than most—not that her claims are qualitatively different.

United additionally argues that Gunter's claims are not typical of the proposed Positive Balance Class because that class excludes former Griffith Savings Bank ("Griffith") account holders as well as Gunter herself. The Positive Balance Class contains "those members of [United] who were charged an overdraft fee between October 3, 2011, and the present for a transaction posted by the MISER system when at the time the transaction posted the class member's actual balance was equal to or greater than the transaction causing the overdraft." (ECF No. 64 at 18.) United argues that Gunter does not fit within this definition because "her account remained on Symitar until the end of January 2012." (ECF No. 69 at 11.) Gunter is a member of the proposed class, though, because she was charged overdraft fees that were posted by the MISER system. "On July 23, 2015, Plaintiff incurred eight overdraft fees of $30 each for purported overdraft transactions." (ECF No. 60 at ¶ 23.) United processed those transactions in the MISER system because Gunter's account had been transferred from Symitar to MISER at that point. (*See* ECF No. 69 at 11.) United argues that the former Griffith account holders do not fit the definition of the class because their accounts were on the Fiserve ITI system until May 2012. (ECF No. 69 at 11.) It is true that some former Griffith clients with similar claims to Gunter will not be part of the class. For instance, former Griffith clients who only overdrafted once in April 2012 and never again will not be part of the Positive Balance Class because those transactions would have been posted by ITI instead of MISER. That fact does not defeat the typicality of Gunter's claims,

---

[4]United argues that the account agreements and opt-in agreements are integrated contracts but fails to identify any language that integrates them. (*See* ECF No. 69 at 7.)

however. Typicality does not require Gunter to seek out and include in her proposed class all individuals who might share her claims. Gunter need only show that her breach of contract claim is typical of the breach of contract claims that could be brought by members of the proposed class as she defines it, which she has done.

### d. Adequacy of Counsel

The adequacy of counsel is considered under Rule 23(a)(4) and Rule 23(g). *See Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1122 (9th Cir. 2014) (noting that "named plaintiff's and class counsel's ability to fairly and adequately represent unnamed [plaintiffs]" are "critical requirements in federal class actions under Rules 23(a)(4) and (g)"). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Class counsel assert that they have "significant class action, litigation, and trial experience, are competent, and have been competent in representing the Classes." (ECF No. 64 at 22.) Class counsel further represent that their firms "have extensive experience in consumer class actions, and in particular, expertise in overdraft fee litigation." (*Id.*) United does not dispute these assertions, and class counsel has been preliminarily successful in cases similar to this one. *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 118859, at *7 (N.D. Cal. Jan. 12, 2017) (denying in part motion to dismiss with respect to EFTA claim in similar case prosecuted by McCune Wright LLP and The Kick Law Firm among others); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 857 (W.D. Mich. 2016) (denying motion to dismiss in similar case prosecuted by McCune Wright LLP and The Kick Law Firm among others); *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 17 (D.D.C. 2016) (denying in part motion to dismiss in similar case prosecuted by McCune Wright LLP and The Kick Law Firm among others).

///

The named plaintiff, Tonya Gunter, and her counsel do not appear to have any conflicts of interest with other proposed class members. Gunter's interests are "wholly aligned" with the other proposed class members "because she was charged overdraft fees when [her] account had a positive ledger balance." (ECF No. 64 at 22.) Counsel represents that "[s]he understands that she is pursuing this case on behalf of all Class members similarly situated and understands she has a duty to protect the absent Class members. She has actively participated in the litigation by frequently conferring with class counsel about the case and its status, assisting class counsel by gathering documents and other information, responding to written discovery, and being prepared and willing to testify at deposition and trial on behalf of the Class if necessary." (ECF No. 64 at 22.) Counsel's interest appears to be aligned with the class given their pursuit of these kinds of lawsuits in other forums. United does not dispute these assertions.

### 2.    Rule 23(b) Requirements

Plaintiff seeks to satisfy the third prong of Rule 23(b). Under that provision, a class action may be maintained if Rule 23(a) is satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters pertinent to these findings including "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

#### a.    Predominance

The predominance requirement is satisfied "[w]hen common questions present a *significant aspect of the case* and they can be resolved for all members of the class in a single adjudication . . . ." *Hanlon*, 150 F.3d at 1022.

The legal question presented by the proposed Positive Balance Class—whether United breached its contractual agreements—predominates over any individual characteristics of the proposed class members. The individual issue of which account agreement the proposed class members signed is immaterial as all proposed class members were subject to the same contractual language regarding overdraft fees in their account agreements and opt-in agreements. (ECF No. 64 at 21.) Although United's clients have signed different account agreements over the years, the language regarding overdrafts has remained consistent. (*Id.* at 8 n.2.) Other individual issues such as how frequently clients overdrafted, the amount of their charges, the nature of their transactions, and the source of the holds that reduced their available balance are legally irrelevant to the question Gunter presents on behalf of the proposed class.

The legal question presented by the proposed Regulation E Class—whether United violated Regulation E—also predominates over any individual characteristics of the proposed class members. Although some proposed class members received print disclosure forms and others could opt in by telephone without receiving the disclosure notice, (ECF No. 64 at 15-16), the legal question predominates over this factual difference. And that question is whether United's failure to disclose its practice—either because the opt-in agreement was ambiguous or because the client received no disclosure at all as in the case of some who opted in by phone—violated Regulation E.

### b. Superiority

In order to determine superiority, the Court looks to the (1) class members' interest in controlling separate actions; (2) the existence and extent of any current litigation; (3) the desirability of the forum; and (4) the difficulties in managing a class action. Fed. R. Civ. P. 23(b)(c)(A)-(D).

As to prong (1), the proposed class members have little interest in controlling separate actions because the individual damages are quite small—as low as $30.00. (ECF No. 64 at 30.) Such small damages cannot justify or sustain individual lawsuits. As to prong (2), there is no evidence that United is already engaged in litigation relating to

its overdraft practices that would render this class action duplicative or risk inconsistent outcomes on similar legal questions. As to prong (3), the forum is appropriate because United serves clients in the forum state, and United has failed to contest the forum's desirability.

United has thrown its weight behind prong (4), arguing that it is impossible for Plaintiff's expert to identify all the members of both proposed classes. While there is no administrative feasibility prerequisite to class certification, courts must still consider the likely difficulties in managing a class action. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127–28 (9th Cir. 2017). As to the proposed Regulation E Class, United argues that those proposed class members cannot be identified because the data source Gunter's expert, Arthur Olsen ("Olsen"), plans to use to identify proposed class members is underinclusive.[5] (ECF No. 69 at 13-14.) Although Olsen seeks to identify essentially all clients of United who were charged an overdraft fee since August 15, 2010, for the proposed Regulation E Class (*see* ECF No. 64 at 18), the data source Olsen intends to use—the MISER database—does not include transactions from certain time periods for some of United's clients. Specifically, the MISER database does not include transactions from January 1, 2012, to May 2012 for former Griffith clients that United acquired.[6] (ECF No. 69 at 11.) The MISER database also does not include transactions from October 1, 2011, to January 27, 2012, for former Clearstar clients that United acquired.[7] (*Id.*) Consequently, the MISER database cannot yield all "members of [United] who opted in

---

[5] United argues that Olsen's expert report failed to comply with Fed. R. Civ. P. 26(a)(2)(B)(v), which requires expert reports to contain "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Gunter implicitly concedes that Olsen's report failed to disclose Olsen's involvement in a case where the motion to certify a class was denied. (ECF No. 81 at 15-16.) Gunter also provided a list of all cases in which Olsen has testified. (ECF No. 81-7.) United's challenge to Olsen's report is not a proper issue before the Court. Moreover, Gunter has apparently cured the deficiencies with respect to Olsen's report.

[6] Transactions relating to former Griffith clients were logged in a database called Fiserve ITI, but that database has been lost or no longer exists. (ECF No. 69 at 15.)

[7] Transactions relating to former Clearstar clients were logged in a database called Symitar that remains accessible. (ECF No. 81 at 14.)

to [United's] debit card overdraft service and were charged an overdraft fee for an ATM or debit card transaction at any time between August 15, 2010, through the present." (ECF No. 64 at 18-19.) For instance, a former Clearstar client who opted in to United's overdraft service and was charged an overdraft fee only once in November 2011 and never again would not appear in any searches of the MISER database.

But Olsen plans to use other data sources to identify the former Clearstar and Griffith clients who are part of the proposed class: the Symitar database and Nonsufficient Funds ("NSF") reports. The Symitar database will yield former Clearstar clients who are part of the class because it contains the transactions of former Clearstar clients from September 25, 2009, to January 27, 2012. (*See* ECF No. 69 at 11.) This time span contains the earliest relevant date for the proposed class—August 15, 2010. NSF reports will yield former Griffith clients who are part of the class because those reports contain information that will allow Olsen "to determine when a Courtesy Pay overdraft fee or [NSF] fee is assessed on an ATM or debit card transaction." (ECF No. 81 at 14.) The incomplete MISER database appears to pose no obstacle to identifying members of the proposed Regulation E Class.

Turning to the proposed Positive Balance Class, United argues those proposed class members cannot be identified because the MISER database does not include "every daily ACH and check exception report." (ECF No. 69 at 14.) United argues that this data is necessary to "to accurately assess the balance at the time of presentment." (*Id.*) Gunter responds that the proposed Positive Balance Class may be defined without reference to daily ACH and check exception reports. (ECF No. 81 at 13.) The proposed Positive Balance Class would contain United clients who were charged an overdraft fee posted by the MISER system when their ledger balance at the time of the transaction was equal to or greater than the transaction causing the overdraft. (ECF No. 64 at 18.) Daily ACH and check exception reports are irrelevant to this determination because they do not affect ledger balance. (See ECF No. 81 at 13; ECF No. 81-6 at 4.)

///

As to both potential classes, United argues that the lack of ITI data prevents Olsen from identifying proposed class members. But ITI data is irrelevant to the Positive Balance Class because the Positive Balance Class only includes transactions posted by the MISER system. (*See* ECF No. 64 at 18.) And ITI data is not necessary to identify members of the proposed Regulation E Class because Olsen will use the NSF reports to identify which former Griffith clients are class members. (ECF No. 81 at 14.)

**V.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that United's Motion for Partial Summary Judgment (ECF No. 67) is denied.

It is further ordered that Gunter's Class Certification Motion (ECF No. 64) is granted.

DATED THIS 25th day of September 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE